19-145-ag
*Zepeda-Lopez, et al. v. Garland*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2021

(Argued:  September 15, 2021        Decided:  June 28, 2022)

Docket No. 19-145-ag

———————————

CARLOS ALEXANDER ZEPEDA-LOPEZ, KARLA ARGENTINA ZEPEDA-LOPEZ, MELISSA
ISABEL ZEPEDA-LOPEZ, WUENDY YESSENIA RODRIGUEZ-CERDA, MELISSA
ALEXANDRA ZEPEDA-RODRIGUEZ, ANSONY EMMANUEL AGUILAR-CASTRO,

*Petitioners*,

*v.*

MERRICK B. GARLAND, United States Attorney General,

*Respondent.*

———————————

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

———————————

Before:      LIVINGSTON, *Chief Judge*, AND CHIN AND NARDINI, *Circuit Judges*.

Petition for review of a decision of the Board of Immigration Appeals entered December 14, 2018, dismissing an appeal from the decision of an Immigration Judge denying asylum and the withholding of removal to petitioners, who are dual citizens of Honduras and Nicaragua, and their relatives. The agency denied relief based on *Matter of B-R-*, where the BIA held that to qualify as a "refugee" under the Immigration and Nationality Act, dual nationals must show persecution in both their countries of nationality. 26 I. & N. Dec. 119, 121 (B.I.A. 2013). The agency determined that while petitioners demonstrated persecution in Honduras, they did not show persecution in Nicaragua, and it concluded that they were not refugees and therefore not eligible for asylum. We grant the petition for review and hold that, to qualify as a "refugee" under the INA, a dual national asylum applicant need only show persecution in any singular country of nationality.

PETITION GRANTED, BIA DECISION VACATED, AND CASE REMANDED.

---

CHRISTINA COLÓN WILLIAMS, Esperanza Center for Law & Advocacy, Norwalk, CT, *for Petitioners.*

MONICA G. ANTOUN, Trial Attorney (Brian Boynton, Acting Assistant Attorney General, Shelley R. Goad, Assistant Director, *on the brief*), Office of

Immigration Litigation, United States Department of Justice, Washington, DC, *for Respondent.*

JON BAUER, Asylum and Human Rights Clinic, University of Connecticut School of Law, Hartford, CT, *for Amici Curiae HIAS, International Refugee Assistance Project, Asylum Seeker Advocacy Project, and Integrated Refugee & Immigrant Services, in support of Petitioners.*

---

CHIN, *Circuit Judge*:

Petitioners seek review of a December 14, 2018, decision of the Board of Immigration Appeals (the "BIA") affirming a decision of an Immigration Judge (the "IJ") denying asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") to petitioners Carlos Alexander Zepeda-Lopez ("Carlos"), Karla Argentina Zepeda-Lopez ("Karla"), Melissa Isabel Zepeda-Lopez ("Melissa Isabel"), Wuendy Rodriguez-Cerda ("Wuendy"), Melissa Alexandra Zepeda-Rodriguez ("Melissa Alexandra"), and Ansony Emmanuel Aguilar-Castro ("Ansony") (collectively, "Petitioners") and ordering their removal to Nicaragua. Petitioners entered the United States in 2014 and were placed into removal proceedings later that year. Petitioners applied for asylum and withholding of removal under the Immigration and Nationality Act (the "INA"),

3

8 U.S.C. §§ 1158 and 1231(b)(3), respectively, and for relief under CAT, *see* 8 C.F.R. § 208.16. Carlos, Karla, and Melissa Isabel are siblings, and all three are citizens of both Honduras and Nicaragua. They applied as the lead asylum respondents and designated Wuendy, Melissa Alexandra, and Ansony as derivative applicants.

As a general matter, to be eligible for asylum and withholding of removal, an individual must be a "refugee." 8 U.S.C. § 1158(b)(1)(A). But this is only one step in the asylum process. Even if an individual is a refugee, there are other bars to asylum, *see* 8 U.S.C. §§ 1158(a)(2) (exceptions to authority to apply for asylum), 1158(b)(2) (exceptions to eligibility for asylum), and even assuming all bars are overcome, the decision whether to grant a particular asylum application is still a matter of discretion for the Attorney General. *See, e.g.*, *Ojo v. Garland*, 25 F.4th 152, 163 (2d Cir. 2022). Here, the IJ denied asylum and withholding of removal to all Petitioners at the initial step, concluding that they did not meet the definition of refugee.

The IJ found that Petitioners did not meet the definition of refugee because of what it described as the "Dual Nationality Bar to Asylum." Cert. Admin. R. at 139. In doing so, the IJ relied on *Matter of B-R-*, which interpreted

4

the INA to require that a dual national asylum applicant demonstrate persecution in both countries of nationality to qualify as a refugee. 26 I. & N. Dec. 119, 121 (B.I.A. 2013). The IJ found that Petitioners made the necessary showing as to Honduras -- but not as to Nicaragua -- and therefore were not "refugees" under 8 U.S.C. § 1101(a)(42)(A). The BIA dismissed Petitioners' appeal, which requested, in part, that the BIA overrule *Matter of B-R-*.

We hold that to be considered a "refugee" under § 1101(a)(42)(A), a dual national need only show persecution in any singular country of nationality. Accordingly, we GRANT the petition for review, VACATE the BIA's December 14, 2018, decision, and REMAND to the BIA for further proceedings in accordance with the proper legal standard.

## *BACKGROUND*

### A. *The Facts*

Carlos, Karla, and Melissa Isabel are siblings who grew up and lived primarily in Honduras. They hold secondary Nicaraguan citizenship through their mother, who was born in Nicaragua. Wuendy is Carlos's wife and Melissa Alexandra is their daughter. Ansony is Karla's husband. Petitioners fled Honduras in 2014 after they experienced continued extortion and physical

5

violence from members of the Mara 18 gang.  All Petitioners except for Ansony and Karla, who was pregnant at the time, went to Nicaragua temporarily after they escaped from Honduras and before they arrived in the United States.

Petitioners fled Honduras because, beginning in 2010, the Mara 18 gang extorted the members of the family and threatened to kill them if they did not pay a monthly tax.  Although Mara 18 successfully forced the family to pay the tax, four armed gang members attacked the family home in February 2014.  During the attack, the Mara 18 gang members asked about family members who had ties to a rival gang and marked the walls of the family home with the number 18.  The attackers strangled and threatened to kill Melissa Isabel, and they violently beat and tied up both Carlos and Ansony.  Petitioners sought help from the Honduran police, but the police responded only by saying that the family "were dead people already" for calling the police.  Cert. Admin. R. at 226.  After the attack, Petitioners relocated multiple times to other towns in Honduras.  Each time, they were tracked down, threatened, or followed by Mara 18.

Prior to the events in Honduras, Petitioners also experienced violence in Nicaragua.  Carlos went to school in Nicaragua around 2003 for two years of elementary school and then from 2008 to 2011 for high school, where he

6

met Wuendy. In June of 2012, during a two-week trip to Nicaragua to visit Wuendy and his just-born daughter, Melissa Alexandra, Carlos was stabbed multiple times and spent five days in a Nicaraguan hospital with a perforated lung. Karla and Melissa Isabel spent some of their childhoods in Nicaragua and testified that they were sexually abused as young children by their stepfather there. During the time that Petitioners were in Nicaragua before coming to the United States, the family received a threatening phone call believed to be from Mara 18.

All Petitioners entered the United States at Eagle Pass, Texas. Karla did so on May 10, 2014. Ansony entered on either October 7 or November 28, 2014. Carlos, Wuendy, and Melissa Alexandra entered on October 7, 2014, as did Melissa Isabel. Petitioners did not have valid entry documents, nor were they granted admission or parole after inspection.

**B.** *The Proceedings Below*

Each Petitioner was served with a Notice to Appear shortly after entry into the United States. The removal proceedings were consolidated into a single proceeding at a Master Calendar hearing on October 6, 2015. Two hearings with respect to Petitioners' applications for asylum were ultimately held

7

before Immigration Judge Michael W. Straus, on January 30 and February 7, 2017. Carlos, Karla, and Melissa Isabel were the lead applicants. Wuendy and Melissa Alexandra were Carlos's derivative applicants; Ansony was Karla's derivative applicant.

The IJ denied Petitioners' applications for asylum, withholding of removal, and relief under CAT on October 6, 2017, and ordered Petitioners to be removed to Nicaragua. The IJ entered positive credibility determinations for Carlos, Karla, and Melissa Isabel and found that Petitioners "experienced past persecution in Honduras," as "their family was threatened repeatedly by Mara-18." Cert. Admin. R. at 103-04. Additionally, the IJ found that Petitioners demonstrated that they were persecuted on account of a protected ground and that the Honduran government was unwilling and unable to protect them. The IJ nevertheless denied Petitioners' application. In doing so, it cited the "Dual Nationality Bar to Asylum." *Id*. at 107. Under the precedential *Matter of B-R-* decision, Petitioners were required to "demonstrate a well-founded fear of persecution in both Honduras and Nicaragua in order to be eligible for asylum." *Id*. The IJ explained that Petitioners did not demonstrate such fear as to

8

Nicaragua.  Thus, the IJ denied Petitioners' applications for asylum and withholding of removal, and ordered their removal to Nicaragua.[1]

Petitioners appealed the IJ's denial of their applications for asylum and withholding of removal.  On December 14, 2018, the BIA dismissed Petitioners' appeal.  The BIA agreed with the IJ that Petitioners did not, as required under *Matter of B-R-*, establish persecution on account of a protected ground in Nicaragua.  In a two-sentence paragraph, the BIA also explained that it was "not persuaded" by Petitioners' arguments that *Matter of B-R-* was wrongly decided and that "therefore we will continue to follow it."  Cert. Admin. R. at 5.

This petition followed.

### *DISCUSSION*

Where, as here, the BIA adopts the IJ's reasoning and offers additional commentary, "we review the decision of the IJ as supplemented by the BIA."  *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005).  Generally, we review BIA determinations of law *de novo*.  *Iavorski v. U.S. INS*, 232 F.3d 124, 128 (2d Cir. 2000).  When appropriate, however, we afford *Chevron* deference to BIA

---

[1]     The IJ also denied Petitioners' applications for relief under CAT based on a determination that they did not establish it was more likely than not that they would be tortured if removed to Nicaragua.  Petitioners did not appeal the IJ's denial of their applications for relief under CAT.

9

interpretations of the INA. *See Brathwaite v. Garland*, 3 F.4th 542, 547 (2d Cir. 2021). To determine whether *Chevron* deference applies, we first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter . . . ." *Id.* "If, however, there is ambiguity," *Chevron* requires that we "defer to an agency's interpretation of the statute if that interpretation is reasonable." *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013); *see Chevron*, 467 U.S. at 843. "Where the BIA's interpretation is arbitrary, capricious, or manifestly contrary to the statute, it merits no deference." *Brathwaite*, 3 F.4th at 547 (citation and internal quotation marks omitted).

Petitioners argue that the BIA incorrectly interpreted the INA in *Matter of B-R-* and contend that the statutory text and legislative history establish that a dual national need show persecution in only one country of nationality. Here, Congress has spoken directly to the precise question at issue. As we discuss below, the INA unambiguously requires an applicant for asylum to show well-founded fear of persecution in any one country of the applicant's nationality rather than in all such countries.

**A.** *The Statutory Text*

**1.** *Language of 8 U.S.C. § 1101(a)(42)(A)*

"When interpreting a statutory provision, we begin with the language of the statute." *Nwozuzu*, 726 F.3d at 327. We determine whether the statutory language is ambiguous "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). We "consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." *Id.* (quoting *Holloway v. United States*, 526 U.S. 1, 6 (1999)).

The INA defines a refugee, in relevant part, as follows:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A).  No other circuit has yet addressed how to interpret

8 U.S.C. § 1101(a)(42)(A) as it relates to dual nationals.[2]

We start with the words of the statute.  The word "any" has multiple

meanings, including "one or some indiscriminately of whatever kind."  *Any*,

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see also Cohen v. JP Morgan*

*Chase & Co.*, 498 F.3d 111, 117 (2d Cir. 2007) ("As the Supreme Court has

frequently observed, use of the word 'any' in statutory text generally indicates

Congress's intent to sweep broadly to reach all varieties of the item referenced.").

Therefore, in the context of a person with more than one nationality, the phrase

"any country of such person's nationality," by itself, could refer to one country or

to some or all countries of the applicant's nationality.

When looking at the "specific context in which that language is

used," *Kar Onn Lee*, 701 F.3d at 936 (citation omitted), however, the term "any

country" is unambiguously singular.  The phrase "any country of such person's

_____

[2]    Some unpublished decisions in other circuits apply *Matter of B-R-* but do not opine on whether the BIA correctly interpreted the INA.  *See Koyo v. Barr*, 768 F. App'x 320, 328-29 (6th Cir. 2019) (affirming the denial of asylum in part because the BIA adequately considered evidence that the petitioner was a citizen of both the Democratic Republic of Congo and Angola); *see also Grimaldo-Rubiano v. U.S. Att'y Gen.*, 684 F. App'x 802, 803 (11th Cir. 2017) (per curiam) (affirming the denial of asylum when the petitioner did not meet the refugee definition because he feared persecution in Venezuela but not Colombia).

12

nationality" is followed by the requirement that the person be "unable or unwilling to return to . . . *that* country." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). The word "that" is singular. In 1980, when Congress enacted the INA's current definition of refugee, "that" referred to "the *one* singled out, implied, or understood." *That*, *The American Heritage Dictionary* (2d Collegiate ed. 1982) (emphasis added); *see also That*, *Oxford English Dictionary* (2d ed. 1989) ("denoting *a* thing or person pointed out or present, or that has just been mentioned") (emphasis added). This definition holds true today, as "that" refers to "the person, thing, or idea indicated, mentioned, or understood from the situation." *That*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see also That*, *The American Heritage Dictionary* (5th ed. 2012) ("the *one* designated or implied") (emphasis added). Thus, the text of the statute answers the precise question at issue -- to qualify as a refugee, an asylum applicant need only show persecution in any *singular* country of her nationality.

The Government argues that the text does not provide the clarity necessary to avoid *Chevron* deference, but we are not persuaded for two reasons. First, "[a] fundamental rule of textual interpretation is that neither a word nor a sentence may be given a meaning that it cannot bear." Antonin Scalia & Bryan A.

Garner, Reading Law: The Interpretation of Legal Texts 31 (2012).  And the text of § 1101(a)(42)(A) refers only to a singular country.  Thus, we cannot interpret the word "any" in this context to mean "more than one."

In its argument to the contrary, the Government points to the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("UN Convention"), as well as the 1967 Protocol Relating to the Status of Refugees ("UN Protocol"), *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223 (entered into force Oct. 4, 1967; for United States Nov. 1, 1968).  The UN Protocol incorporated the UN Convention while untethering the definition of refugee from events occurring before January 1, 1951.  UN Protocol, art. I(2). The Government argues that the INA's reference to a singular country is not dispositive, as the "refugee definition in the [UN] Convention also refers to the refugee's country in the singular, while providing for the possibility that a refugee has more than one country of nationality."  Resp't Br. at 19.  But unlike the INA, the UN Convention includes a separate, explicit definition for dual nationals, explaining that:

> In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without

14

any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

UN Convention art. 1(A)(2). Congress did not incorporate this separate dual national definition into the INA. Under our statutory interpretation methods, "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). The term "the country" in the UN Convention encompasses plural countries because an explicit definition permits variation from the term's ordinary meaning. But that separate dual national definition is not in the INA. Thus, in our interpretation of the INA, we are limited to the ordinary meaning of "that country" -- a singular country.

Second, to hold otherwise would require that we read into the INA, as the BIA did in *Matter of B-R-*, the UN Convention's separate dual national definition of refugee. "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). For much of the language of § 1101(a)(42)(A), Congress closely tracks the UN Convention's refugee definition. Yet Congress did not include in the INA the requirement that a dual national must show persecution in all countries of nationality. Instead, Congress adjusted

15

the language of the INA to account for the removal of that requirement.  While

the UN Convention states that a refugee is "any person who . . . is outside *the*

country of his nationality," UN Convention art. 1(A)(2) (emphasis added), the

INA states that a refugee is "any person who . . . is outside *any* country of such

person's nationality," 8 U.S.C. § 1101(a)(42)(A) (emphasis added).[3]  As the INA

excludes the explicit definition included in the UN Convention, it would be

improper for a court to read it into the statute.  We are thus bound to give the

statutory text the only meaning that it can bear:  To qualify as a refugee under

---

[3]      The full UN Convention definition of "refugee" reads as follows:

> [T]he term "refugee" shall apply to any person who:
> . . . .
> As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

> In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

UN Convention art. 1(A)(2).  *Cf.* 8 U.S.C. § 1101(a)(42)(A) (omitting the second paragraph and changing some phrasing in the first).

the INA, a dual national must be outside any one country of her nationality and be unable or unwilling to return to, and unable or unwilling to avail herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

## 2. *The Broader Context of the INA*

Our interpretation is supported by "the broader context of the statute as a whole." *Kar Onn Lee*, 701 F.3d at 936 (citation and internal quotation marks omitted). The INA and our precedent make clear that eligibility for refugee status is distinct from the determination of whether an applicant ultimately receives asylum. For example, the INA has mechanisms that come into play only after an asylum applicant qualifies as a refugee. An applicant with refugee status may nevertheless be ineligible for asylum due to the firm resettlement bar, which applies when "the alien was firmly resettled in another country prior to arriving in the United States." *See* 8 U.S.C. § 1158(b)(2)(A)(vi).[4] Firm resettlement has long meant that a refugee who has an offer of permanent

---

[4] There are also other bars to asylum that, if applicable, mean that an application for asylum must be denied. *See* 8 U.S.C. § 1158(a)(2)(A), (c)(2)(C) (safe third country provision); *see also* 8 U.S.C § 1158(c)(2)(E) (termination of asylum upon acquisition of a new nationality).

residence status or citizenship prior to entering or while in a third country is barred from asylum unless the refugee enters that third country as a necessary means to flee persecution and does not establish significant ties to the country before moving onward. *See Matter of A-G-G-*, 25 I. & N. Dec. 486, 489-98 (B.I.A. 2011).[5] The firm resettlement bar therefore weeds out asylum applicants who have a safe homeland to turn to by examining the manner and degree to which the applicant is associated with a third country. Accordingly, refugee status is necessary, but not sufficient by itself, for a person to receive asylum.

We have also acknowledged this multi-step process in our precedent by distinguishing between those who are refugees and those who are eligible for asylum. For example, we have held that "[t]he United States offers asylum to refugees not to provide them with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn." *Sall v. Gonzales*, 437 F.3d 229, 233 (2d Cir. 2006) (per curiam). This reflects the bigger picture of the statutory scheme, where an applicant's connection to third countries is

---

[5] The newest regulation defining firm resettlement was promulgated in January 2021 but is the subject of a nationwide injunction. 8 C.F.R. § 1208.15(a)(3) (2021); *see Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-CV-09253, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021). On February 4, 2022, the case was administratively closed by stipulation, but the preliminary injunction remains in effect.

18

considered not at the eligibility-for-refugee-status step but rather thereafter, when the United States decides whether the applicant "was firmly resettled in another country prior to arriving in the United States," 8 U.S.C. § 1158(b)(2)(A)(vi), or even later, when the agency decides as a matter of discretion whether it will offer asylum to such a refugee based on the "totality of circumstances," *Ojo*, 25 F.4th at 162-64.

Hence, the INA treats the determination of refugee status and the grant of asylum as distinct steps in the application process. Provisions such as the firm resettlement bar indicate that the grant-of-asylum step is when the asylum applicant's connections to third countries, including ties through dual nationality, are considered. Connections, if any, to third countries can also be considered when the agency decides whether, after refugee eligibility has been determined, to grant asylum as a matter of discretion. Thus, we conclude that, for purposes of initial qualification as a refugee under 8 U.S.C. § 1101(a)(42)(A), dual nationals need only show persecution in one of the countries of which they are a citizen.

**B.** *Legislative History*

Because Congress clearly answered how the INA addresses dual nationals in the text and structure of the statute, we need not rely on legislative history. *State Farm Fire and Cas. Co. v. U.S. ex rel. Rigsby*, 137 S. Ct. 436, 444 (2016). Nevertheless, because the Government argues that there is "clear congressional intent to follow the [UN] Convention's definition of refugee" -- which requires dual nationals to show persecution in both countries of citizenship -- we briefly address the legislative history. Resp't Br. at 43.

While the INA was enacted in 1952, the modern definition of "refugee" arises from an amendment, the Refugee Act of 1980 (the "1980 Act"). Thus, the relevant legislative history is that of the 1980 Act, which shows that, in passing the Act, Congress sought to "regularize[] and formalize[] the policies and the practices that [had] been followed in recent years." H.R. Rep. No. 96-608, at 10 (1979). The House Report does not, however, identify which past policies or practices with respect to the treatment of dual national asylum applicants the

1980 Act was intended to codify.[6]  Nor does any other House or Senate report speak to the treatment of dual national asylum applicants under the new definition.  *See* S. Rep. No. 96-590 (1980); H.R. Rep. No. 96-781 (1980); S. Rep. No. 96-256 (1979).  Thus, the legislative history does not clarify whether dual nationals with a well-founded fear of persecution in only one country of nationality are "refugees" under the INA.

We have been pointed to a number of administrative decisions by the BIA and its predecessor agencies where an applicant's dual nationalities did not trigger ineligibility for asylum.  For example, in 1966, the Immigration and Naturalization Service did not consider an applicant's dual Chinese and

---

[6]      As the Government correctly points out, the Supreme Court has held that "[i]f one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the [UN Convention and UN Protocol]."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).  In *Cardoza-Fonseca*, the Supreme Court explained that "the definition of 'refugee' that Congress adopted is virtually identical to the one prescribed by [the UN Convention and UN Protocol]."  *Id.* at 437.  Indeed, the portion of the definition of "refugee" relevant to *Cardoza-Fonseca*'s examination of the "well-founded fear" standard is identical between the INA and the UN Convention and UN Protocol.  But here, we are faced with an entirely different question -- whether the INA's definition of refugees excludes dual nationals who establish fear of persecution in only one country of nationality.  As discussed above, although the INA's definition of refugee is "*virtually* identical to the one prescribed by [the UN Convention and UN Protocol]," *id.* (emphasis added), one notable difference between the two definitions is that Congress chose not to include the explicit exclusion of such dual nationals.

21

Taiwanese -- then known as Formosan -- nationalities to be a bar to asylum under § 203(a)(7) of the 1965 amendments to the INA, instead denying asylum based on the applicant's firm resettlement in Taiwan. *Matter of Sun*, 12 I. & N. Dec. 36, 38-39 (Reg'l Comm'r 1966). This handful of agency decisions, although illustrative, does not amount to a codified, longstanding, unbroken administrative practice regarding dual nationals at the time of the 1980 Act, and so we cannot say with any confidence that the 1980 Act was intended to codify them.

In the absence of authoritative legislative history or administrative practice that illuminate what past policies the 1980 Act sought to formalize, we have also been directed to several historical examples of legislative and executive actions taken in response to refugee crises involving dual nationals. Prior to 1980, there were multiple occasions when dual nationals were deemed eligible for refugee status, even if they were able to relocate to another country -- including another country of nationality. For example, in 1957 and 1958, residents of the Portuguese archipelago the Azores were displaced by a volcanic eruption. These refugees were allowed to remain in the United States despite being nationals of Portugal. Azorean Refugee Act of 1958, Pub. L. No. 85-892, 72

22

Stat. 1712 (1958) (expired 1960).[7]  It has also been suggested by an academic

commentator, who submitted an amicus brief to this Court, that the framers of

the 1980 Act may have been responding, at least in part, to the situation then

faced by many Soviet Jews fleeing from communism.  Jon Bauer, *Multiple*

*Nationality and Refugees*, 47 Vand. J. Transnat'l L. 905, 976 (2014).  Israel provided

these Soviet Jews with a claim to Israeli citizenship under the Law of Return.  *See*

Claude Klein, *The Right of Return in Israeli Law*, 13 Tel Aviv Univ. Stud. L. 53, 55

(1997).  In fact, in the years leading up to the late 1970s, Israel actively pursued a

policy of influencing Jewish refugees to settle in Israel rather than in the United

States.  *See* Fred A. Lazin, *"Freedom of Choice": Israeli Efforts to Prevent Soviet Jewish*

*Émigrés to Resettle in the United States*, 23 Rev. Pol'y Rsch. 387, 387 (2006).

---

[7]    Even earlier, during the three years covered by the Refugee Relief Act of 1953,
Pub. L. No. 203, 67 Stat. 400 (1953), 209,000 individuals fleeing communist countries
were allowed to enter the United States as refugees.  *See* Jon Bauer, *Multiple Nationality
and Refugees*, 47 Vand. J. Transnat'l L. 905, 962 (2014).  Many of these individuals,
however, were also nationals of non-communist European countries, including
Germany and the Netherlands.  Millions of ethnic Germans were expelled from
countries falling under Communist domination, and many were taken in by West
Germany.  *See* H.R. Rep. No. 83-974, at 11 (1953).  Under Germany's Basic Law, these
expellees were considered German nationals as soon as they entered German territory.
Bauer, *supra*, at 962 n.264.  The Refugee Relief Act of 1953 ultimately allocated 55,000
visas to such German expellees residing in West Germany.  *Id.*  In addition, many Dutch
Indonesians left Indonesia for the Netherlands.  The Netherlands, however, were "badly
devastated by the war, and already seriously overcrowded."  H.R. Rep. No. 83-974, at 15
(1953).  The Refugee Relief Act of 1953 allocated visas for thousands of these Dutch
Indonesians.  Bauer, *supra*, at 962 n.266.

Nonetheless, in response to urging from American Jewish organizations, the United States government allowed the entry of these Soviet Jews as political refugees. *See id.* By 1976, the majority of the Jewish immigrants fleeing the Soviet Union who left with exit visas bound for Israel chose, instead, to settle in the United States. *Id.* at 392-94.

At the same time, there appear to have been counterexamples in which the United States "declined to take groups of refugees on the ground that they were nationals of a country that would accept them." Bauer, *supra*, at 964. In 1972, amidst turmoil in Uganda, the United States granted parole only to stateless Asian Ugandans and not those with British citizenship. *Id.* Similarly, in the mid-1970s, the United States did not accept any of the hundreds of thousands of Portuguese nationals fleeing Angola and Mozambique. *Id.* Ultimately, although these examples of past governmental policies provide interesting background, they fall on both sides of the dispute we must settle. Accordingly, they shed little light on which past policies or practices regarding dual nationals Congress intended to codify through the passage of the 1980 Act.

As we have already concluded above, however, there is no interpretive ambiguity in the text and structure of the statute, and so there is no

reason to resort to legislative history or other records of previous administrative and legislative practice. We therefore disagree with the Government's contention that the legislative background compels us to conclude that dual nationals need to show persecution in both countries of nationality to be considered refugees.

## C.    *The BIA's Interpretation*

As the statutory text unambiguously provides that dual nationals need show persecution only in any singular country of nationality to qualify as a refugee under the INA, we need not defer to the BIA's interpretation of § 1101(a)(42)(A). In any event, the BIA's interpretation is unreasonable; *Matter of B-R-* required dual nationals to show well-founded fear of persecution in both countries of nationality. 26 I. & N. Dec. at 121. Such a reading is manifestly contrary to the text of the INA.

Not only does § 1101(a)(42)(A) use the singular "that country," but it also requires that the dual national be "unable or unwilling to return to . . . that country." 8 U.S.C. § 1101(a)(42)(A). As shown by the examples discussed above, it is certainly possible for a dual national to be a citizen of a country in which she has never set foot. A country that utilizes a *jus sanguinis* system of citizenship

25

permits a dual national to inherit citizenship through a parent -- as the Zepeda-Lopez siblings did here.  *See* Patrick Weil, *Access to Citizenship:  A Comparison of Twenty-Five Nationality Laws*, *in* T. Alexander Aleinikoff & Douglas Klusmeyer, Citizenship Today:  Global Perspectives and Practices 17, 17 (2010) (defining *jus sanguinis* as "citizenship as the result of the nationality of one parent or other more distant ancestors").  It is impossible, however, for an asylum applicant to "return" to a country where she has never been.  *See Return*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("to go back or come back again"); *Return*, *The American Heritage Dictionary* (2d Collegiate ed. 1982) ("[t]o go or come back, as to an earlier condition or place").  The application of § 1101(a)(42)(A) in such a circumstance would make no sense.

In *Matter of B-R-*, the BIA ended its inquiry by relying solely on undisputed congressional intent to incorporate the UN Convention's definition of refugee.  But the BIA's interpretation ignored the fact that Congress incorporated only select portions of the UN Convention's definition, and the BIA's broader reading of congressional intent is flatly contradicted by the text of the INA.  The BIA also overlooked much of the nuance behind the text and the relevant legislative history.  We thus reject the BIA's interpretation in

26

*Matter of B-R-*, 26 I. & N. Dec. 119 (B.I.A. 2013). As the INA does not require dual nationals to show persecution in all countries of nationality to qualify as refugees, we need not address Petitioners' argument that they showed persecution in Nicaragua.

## *CONCLUSION*

For the reasons set forth above, the petition is GRANTED, the December 14, 2018, decision of the BIA is VACATED, and the case is REMANDED to the BIA for further proceedings in accordance with the proper legal standard.