**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-1026**

———————

SHAKER ULLAH,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued: March 22, 2023                    Decided: July 6, 2023

———————

Before GREGORY, Chief Judge, and DIAZ and THACKER, Circuit Judges.

———————

Petition for review granted; reversed and remanded with instructions by published opinion. Judge Diaz wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

———————

**ARGUED:** Benjamin Ross Winograd, IMMIGRANT & REFUGEE APPELLATE CENTER, LLC, Alexandria, Virginia, for Petitioner. Robert Michael Stalzer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brian Boynton, Principal Deputy Assistant Attorney General, Stephen J. Flynn, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

DIAZ, Circuit Judge:

The United States' war in Afghanistan required regional allies willing to aid the effort. One such ally was Shaker Ullah, a Pakistani businessman who sold supplies to coalition forces. This invoked the wrath of the Pakistani Taliban, which demanded exorbitant payments from Ullah under threat of death. Ullah repeatedly refused, and the Taliban attempted to carry out its threat, promising to hunt him until it succeeded.

After losing his business, home, and nearly his life, Ullah fled to the United States seeking asylum. The Immigration Judge and Board of Immigration Appeals both recognized that Ullah suffered past persecution entitling him to a presumption that the Taliban would continue to target him if he returned to Pakistan. But they agreed with the government that because Ullah lived in Islamabad (the capital of Pakistan) for a few weeks without the Taliban finding him, he could live in a new area of the country without fear of reprisal.

We disagree. Ullah's brief sojourn to Islamabad—where he never left the house— doesn't rebut the presumption that a notorious terrorist organization continues to imperil his life. Since the record would compel any reasonable adjudicator to conclude Ullah faces a well-founded threat of future persecution, we grant Ullah's petition for review, reverse the Board's denial of Ullah's preserved claims, and remand with instructions that the agency grant relief.

I.

A.

Shaker Ullah is a native and citizen of Pakistan. Born in Peshawar, he grew up in the former Federally Administered Tribal Areas ("FATA"), a quasi-colonial, largely rural area near the Afghanistan border. The FATA region is unstable, described as "a sanctuary for the Taliban, al-Qaida and . . . other fighters." A.R. 469. Terrorist activity is prevalent.

Despite these challenges, Ullah went to university, earning a degree in business administration and finance. He then returned to the FATA and worked at his father's business selling cars and tires (it used to supply oil as well, until the Taliban destroyed the business's oil tanker). The business's customers included United States forces, who were then at war with the Taliban in Afghanistan following the 9/11 attacks. Ullah took over the business in his early twenties.

Soon after, Ullah received two telephone calls from a member of the Pakistani Taliban.[1] The caller labeled Ullah a traitor for supporting the United States and demanded he contribute money to the Taliban's Jihad. Ullah ignored these demands.

Taliban members continued to call, threatening to kill Ullah unless he paid "6 to 8 crore rupees" (about $750,000 to $1,000,000). A.R. 732. Ullah replied that he didn't have the money, but the caller demanded he pay up. Ullah reported these calls to a local tribal

---

[1] The State Department has designated the Pakistani Taliban (though not the Afghan Taliban) a foreign terrorist organization. *See Designated Foreign Terrorist Organizations*, U.S. Dep't of State, https://www.state.gov/foreign-terrorist-organizations/ [https://perma.cc/HEA6-WYJT]. All mentions of "the Taliban" here refer to the Pakistani branch.

agency, but the threats continued, with the Taliban leaving ominous letters at Ullah's office. Members of the Taliban eventually ambushed Ullah in his office, beating him in retribution for his report.

Despite the attack, Ullah continued to resist the Taliban's extortion. But his phone kept ringing. He reached a breaking point on one call, chastising a Taliban leader to "not behave like [an] animal[] and go make honest money." A.R. 733. The leader replied that Ullah had two to three more days to bring the money, or he would die.

Ullah asked one of his village leaders to talk to the Taliban and smooth things over, but the leader didn't want to get involved. So Ullah sequestered himself at home, worried he would be killed if he left the house. Fearing for his safety, Ullah's family tried to send him abroad while those who remained in the FATA moved to other parts of Pakistan. But Ullah was denied a student visa to the United States.

Ullah remained in the FATA, periodically leaving home to run his business. During this time, two persons on motorcycles fired guns into a car carrying Ullah, his brother, and his security guard. His brother and guard were severely hurt but survived; Ullah suffered minor injuries. The Taliban called Ullah afterward, warning that he wouldn't survive its next attack.

Ullah closed his business and escaped to the United Arab Emirates. He stayed there for a month, then returned to Peshawar and moved in with his brother. The Taliban continued to call Ullah and threaten death. It eventually found him in Peshawar and delivered a letter warning that "[o]nly death can spare Shaker Ullah." A.R. 369.

4

Ullah then moved to Islamabad and stayed with his brother's friend for three to four weeks. Ullah didn't receive any threatening letters or encounter the Taliban while there, though he never left the house. And the Taliban kept calling. The friend eventually asked Ullah to leave, explaining, "I cannot put my life in danger." A.R. 734.

Seeing "no other way," Ullah fled Pakistan. *Id.* After twice being denied a visa, Ullah entered the United States without authorization, where he was detained.

B.

Ullah applied for asylum and withholding of removal under the Immigration and Nationality Act and withholding of removal under the United Nations Convention Against Torture. The Immigration Judge ("IJ") denied relief, and the Board of Immigration Appeals affirmed.

The IJ found Ullah to be a credible witness who established past persecution due to an imputed "pro-American" political opinion. A.R. 250. Since a finding of past persecution gives rise to a presumption of a well-founded fear of future persecution, the burden fell to the government to show by a preponderance of the evidence that Ullah could avoid future persecution through an internal relocation in Pakistan. The government argued relocation was possible and reasonable because the Taliban didn't find Ullah when he stayed in Islamabad.

Reviewing the record, the IJ noted that the Taliban "tend to be located in more concentrated numbers in specific parts of Pakistan," including the FATA. A.R. 253. But Ullah wouldn't have to return to that area, since he closed his business and his family members relocated. The IJ also credited the government's argument that Ullah spent three

5

to four weeks in Islamabad and "did not receive any letters delivered to the door or any threats in person to indicate that the Taliban actually knew where [he] was or that they were looking for him in Islamabad." A.R. 253–54.

The IJ concluded that Ullah "would have the ability to move [to Islamabad] or elsewhere" in Pakistan, as he was in his mid-twenties, single, and "ha[d] a certain maturity . . . and resourcefulness." A.R. 254. And since Ullah has "two brothers and eight sisters, all with different places of living," the IJ reasoned Ullah could "stay at different places while he got situated and looked for someplace to stay." *Id.*

The IJ also concluded that "there is no indication that the Taliban has continued to look for [Ullah] or that they have continued to threaten his family in any way" since he left Pakistan to come to the United States. *Id.* And while "the country conditions in Pakistan do indicate that there continue to be problems with militants throughout" the country, the IJ found "no indication that [Ullah] would be specifically targeted in each of those areas." A.R. 255. Instead, Ullah "would face the same general violence that the population at large faces." *Id.*

The IJ determined "the presumption [of future persecution] was overcome because it has been demonstrated by a preponderance of the evidence that [Ullah] could avoid future persecution by an internal relocation." A.R. 253. The IJ denied Ullah's application for asylum and his claim for withholding of removal, as well as his Convention Against Torture claim.

6

In a single-member decision, the Board affirmed, agreeing that Ullah could "relocat[e] to another part of Pakistan, and under the circumstances, it would be reasonable to expect him to do so."  A.R. 3–4.

This petition for review followed.

## II.

Ullah doesn't discuss his Convention Against Torture claim in his briefs, so we consider it forfeited.  *See Cortez-Mendez v. Whitaker*, 912 F.3d 205, 208 (4th Cir. 2019).  We thus examine only his claims for asylum and withholding of removal under the Immigration and Nationality Act.

Since the Board's order "adopts and affirms the IJ's decision," we review both.  *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014).  We will uphold the Board's decision unless it's "manifestly contrary to the law and an abuse of discretion," reviewing legal determinations de novo and factual findings for substantial evidence.  *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 246 (4th Cir. 2017).  "The Board's determination[] that the future-threat presumption was rebutted" is a "factual finding[] which we must accept unless any reasonable adjudicator would be compelled to conclude to the contrary."  *Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020) (cleaned up).

Although this is a deferential standard, "it's not toothless."  *Id.*  The IJ and Board can't "distort or disregard important aspects of the [noncitizen's] claim, make rulings that are based on an inaccurate perception of the record, or rely on speculation, conjecture, or an otherwise unsupported personal opinion to discredit an applicant's testimony or [his]

7

corroborating evidence." *Id.* (cleaned up). Our examination of the record reveals that Ullah's case has bite.

## A.

We begin with Ullah's asylum claim. The Immigration and Nationality Act authorizes the Secretary of Homeland Security or the Attorney General to grant asylum to any applicant who proves eligibility. 8 U.S.C. § 1158(a)(1), (b)(1)(A). To be eligible, Ullah must show that he's unable or unwilling to return to Pakistan "because of persecution or a well-founded fear of persecution on account of . . . [his] political opinion." *Id.* § 1101(a)(42).

The Board and IJ agreed that the Taliban targeted Ullah based on an imputed political opinion. And since Ullah established past persecution, it's presumed he has "a well-founded fear of [future] persecution on the basis of the original claim." 8 C.F.R. § 1208.13(b)(1). "The presumption is based on the possibility that a persecutor, once having shown an interest in harming the applicant, might seek to harm the applicant again should the applicant be forced to return within the persecutor's reach." *Matter of N-M-A-*, 22 I. & N. Dec. 312, 317–18 (B.I.A. 1998).

But the agency must deny an applicant's claim if "[t]here has been a fundamental change in circumstances such that [he] no longer has a well-founded fear of persecution" or if he "could avoid future persecution by relocating to another part of [his] country of nationality . . . and under all the circumstances, it would be reasonable to expect [him] to

8

do so." 8 C.F.R. § 1208.13(b)(1)(i). The Board and IJ considered relocation only, so we do the same.[2]

The government bears the burden of "establish[ing] by a preponderance of the evidence that, under all the circumstances, it would be reasonable for [Ullah] to relocate." *Id.* § 1208.13(b)(3)(ii) (2020).[3] This "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011). "[A]n inconclusive record . . . is insufficient . . . because it fails to establish [that a fact] is more likely than not." *Id.*

Relying on Ullah's testimony, the government claimed that his ability to travel to Islamabad and live there for "three to four" weeks revealed he could relocate safely. A.R. 346–47. The IJ and Board found this argument convincing. We don't, nor could any reasonable adjudicator.

---

[2] The government doesn't argue there's been a "fundamental change in circumstances," nor would the record support such a finding. The record showed that the Taliban was still active in the FATA. *See* J.A. 414 (Pakistan 2017 Human Rights Report); *see also* U.S. Dep't of State, *Pakistan 2022 Human Rights Report* at 19, 20, 26 (stating that the Taliban remains active in the former FATA). Nor (as we discuss) has the Taliban lost interest in Ullah.

[3] In 2021, the regulation was amended to create a "presumption that internal relocation would be reasonable" whenever the persecutor is "not the government or a government-sponsored actor." 8 C.F.R. § 1208.13(b)(3)(iii) (2022). But there's a nationwide injunction in effect preventing the implementation, enforcement, and application of this language. *See Pangea Leg. Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021); *see also Reyes-Ramos v. Garland*, 57 F.4th 367, 369 n.1 (1st Cir. 2023) (acknowledging the injunction); *Zepeda-Lopez v. Garland*, 38 F.4th 315, 323 n.5 (2d Cir. 2022) (same). Thus, the previous regulation governs here.

Our decision directly follows from *Ortez-Cruz v. Barr*, 951 F.3d 190 (4th Cir. 2020). In that case, Ortez-Cruz fled an abusive and obsessed partner. *Id.* at 193–94. She applied for withholding of removal, which (like asylum) carries a rebuttable presumption that past persecution entails future persecution. *See* 8 C.F.R. § 1208.16(b)(1)(i), (ii).

The IJ and Board agreed that Ortez-Cruz established a presumption of future persecution. But they ruled that the government rebutted the presumption because there was insufficient evidence her abuser would find her "if she moved farther away to another part of [the country]." *Ortez-Cruz*, 951 F.3d at 197. The "IJ deemed it significant that [the abuser] had not contacted Ortez-Cruz during the eight months she lived with her sisters" in her country of origin. *Id.* And since the abuser "had not contacted Ortez-Cruz for over fifteen years," the IJ and Board concluded the abuser had lost interest. *Id.*

We reversed, finding the government failed to show Ortez-Cruz could "safely and reasonably relocate to avoid a serial abuser," even if the abuser hadn't tried to contact her in recent years. *Id.* at 202. We emphasized that "[t]o rebut the presumption [of future persecution], the government must prove that its view of the evidence . . . is the most convincing one." *Id.* at 198. This required showing that "if Ortez-Cruz relocates, it's more likely than not that [her abuser] won't threaten her *for the rest of her life*." *Id.* at 200 (emphasis added). Since the record was ambiguous as to whether Ortez-Cruz could relocate safely, we granted her petition for review on the withholding-of-removal claim and remanded with instructions to grant relief. *Id.* at 203.

Although *Ortez-Cruz* examined a withholding-of-removal claim, the same logic applies to asylum claims. "Generally speaking, asylum eligibility and withholding-of-

10

removal eligibility share mostly identical requirements," the key difference being that withholding of removal requires a higher "level of likelihood that the applicant would suffer persecution."[4] *Quintero v. Garland*, 998 F.3d 612, 631 (4th Cir. 2021). Since Ullah's past persecution creates a presumption of future persecution under both standards, the eligibility analysis is essentially identical. *Compare* 8 C.F.R. § 1208.13(b)(1) (asylum), *with* 8 C.F.R. § 1208.16(b)(1) (withholding of removal).

The parallels between *Ortez-Cruz* and this case counsel the same result. Like Ortez-Cruz, Ullah lived in another area for a short time without the Taliban finding him. But "brief periods of safe living" don't "negate the potential of future harm." *Ortez-Cruz*, 951 F.3d at 201. And neither the IJ nor the Board discussed Ullah's credible testimony that he never left the house while living in Islamabad. It's plainly unreasonable to "expect [Ullah] to live in hiding for the rest of [his] life." *Id.*; *see also Matter of M-Z-M-R-*, 26 I. & N. Dec. 28, 33 (B.I.A. 2012) (relocation "must present circumstances that are substantially better than those giving rise to a well-founded fear of persecution on the basis of the original claim").

The IJ also speculated that Ullah's "ten siblings who live in different areas . . . could help him get situated." A.R. 4. While this suggests an *ability* to relocate, it says nothing about whether Ullah would be *safe* in those "different areas." In fact, the Taliban found Ullah at his brother's house in Peshawar. And neither the IJ's nor Board's opinion

---

[4] Asylum and withholding of removal also have different disqualifiers. *Compare* 8 U.S.C. § 1158(b)(2), *and* 8 C.F.R. § 1208.13(c), *with* 8 U.S.C. § 1231(b)(3)(B), *and* 8 C.F.R. § 1208.16(d)(2). But none apply to Ullah.

considers whether Ullah's other siblings live in a secure area and (if so) whether they could house him. While it's possible Ullah could safely stay with a sibling, a possibility alone doesn't establish that relocation is reasonable. *See Ortez-Cruz*, 951 F.3d at 198.

The IJ also noted "the length of time that has occurred between these threats taking place," concluding that "there is no indication that the Taliban has continued to look for [Ullah]." A.R. 254. Again, though, it's the government's burden to show that the Taliban won't pursue and find Ullah for the rest of his life. A "lack of contact, standing alone, doesn't rebut the presumption." *Ortez-Cruz*, 951 F.3d at 199.

That's not to say the cessation of communication isn't relevant. But the government must "prove that the *most likely* explanation for [the Taliban's] lack of contact is that [it] had lost interest in [Ullah]." *Id.* The record doesn't support that conclusion. To the contrary, the Taliban still threatened Ullah over the phone during his fleeting refuge in Islamabad. And it's unclear whether the Taliban tried to contact Ullah after he fled from Islamabad to the United States; the government didn't ask Ullah if he or his family had heard from his tormentors since then. The government can't now rely on a silent record to rebut the presumption that Ullah will be subject to future persecution.

True, Ortez-Cruz presented expert testimony that "serial abusers [have] murdered women after twenty-eight years without contact," strengthening her claim that a lack of communication isn't dispositive. *Id*. While Ullah didn't offer similar expert opinions, his affidavit notes a saying from his homeland: "Once Talibans [sic] follow someone they do not spare them easily." A.R. 732. And he submitted the Taliban's letter accusing him of "insult[ing]/humiliat[ing] our [Supreme Commander] due to which our committee has

12

decided . . . [o]nly death can spare Shaker Ullah." A.R. 369. Given this evidence, we don't need an expert to conclude the Taliban likely hasn't forgotten about Ullah.

Lastly, country-condition reports don't prove that Ullah could safely relocate. The IJ concluded that "there is no indication that [Ullah] would be specifically targeted [in other areas of Pakistan] . . . and instead would face the same general violence that the population at large faces." A.R. 255.

The standard, though, is whether there's a preponderance of evidence that Ullah *wouldn't* be "specifically targeted." And the reports don't show that the Taliban is contained in specific regions or that there's a safe area to relocate. The reports do state that militant nonstate actors (including the Taliban) are more prevalent in certain regions, such as the former FATA. But the reports also state that "militant groups [have] kidnapped or [taken] civilians hostage" across the country. A.R. 433. If anything, this suggests there's no safe haven in Pakistan.

In sum, no reasonable adjudicator could find the record evidence establishes that it's more likely than not that the Taliban will cease hunting Ullah if he returns to Pakistan. And where the evidence "would compel any reasonable adjudicator to reach the opposite conclusion, then a remand is unnecessary, and we will reverse the Board's finding." *Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019) (internal quotation marks omitted).

We granted such relief in *Ortez-Cruz*, where the petitioner fled a single pursuer. 951 F.3d at 201. We do the same for Ullah, who's fleeing not one person, but a violent band of terrorists.

13

III.

We grant Ullah's petition for review, reverse the agency's denial of Ullah's asylum and withholding-of-removal claims, and remand with instructions to grant his application. Given our ruling, we deny Ullah's motion for leave to file an addendum to his Reply brief as moot.

*PETITION FOR REVIEW GRANTED;*
*REVERSED AND REMANDED WITH INSTRUCTIONS*